# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Case Number 11-CR-10019-DPW |
| ) | |
| ) | **AFFIDAVIT IN SUPPORT OF** |
| MARWAN CHEBLI, alias Marwan Chebli ) | **REQUEST FOR EXTRADITION** |
| Chebli, alias "El Turko," alias "Samir," ) | |
| ) | |
| Defendant. ) | |

I, ZACHARY R. HAFER, being duly sworn, depose and say:

1. I am a citizen of the United States of America. I currently reside in the Commonwealth of Massachusetts.

2. In June 1999, I received a Bachelor of Arts Degree from Dartmouth College in Hanover, New Hampshire. In May 2003, I received a Juris Doctor Degree from the University of Virginia School of Law, in Charlottesville, Virginia. I was admitted to the Bar of the State of New York in February 2004, where I am currently an active member. From August 2003 to August 2005, I was a law clerk to the Honorable Shirley W. Kram, United States District Court, Southern District of New York. From September 2005 to September 2007, I was an associate in private practice at Debevoise & Plimpton LLP, in New York, New York.

3. From October 2007 to the present, I have been an Assistant United States Attorney for the District of Massachusetts. I am currently assigned to the Office's Organized Crime Drug Enforcement Task Force. My duties include the investigation, prosecution, and trial of federal narcotics and money laundering offenses. Based upon my training and experience, I am an expert in the criminal laws and procedures of this district and of the United States.

1

4. During my practice as an Assistant United States Attorney, I have become particularly knowledgeable in that area of criminal law relating to violations of the federal narcotics and money laundering statutes, including, among others: Title 18, United States Code, Sections 1956 and 1957, laundering of monetary instruments; Title 21, United States Code, Section 963, conspiracy to import a controlled substance into the United States; and Title 18, United States Code, Section 982(a)(1), criminal forfeiture.

5. In the course of my official duties, I have become familiar with the charges and the evidence in the case of <u>United States v. Marwan Chebli, alias Marwan Chebli Chebli, alias "El Turko," alias "Samir" and Leonel Gomez-Guzman, alias "Tony"</u>, Case Number 11-CR-10019-DPW (District of Massachusetts) (hereinafter "the Indictment"). This case arose out of a conspiracy which started in April 2007, and continued to at least February 2011, to launder the proceeds of narcotics trafficking. The charges against the defendants were brought as a result of the United States Drug Enforcement Administration's (hereinafter "DEA") multi-jurisdictional money laundering and drug trafficking investigation that used confidential sources and undercover agents to target money brokers and high-level international drug traffickers. Specifically, this investigation has targeted the money launderers, businesses, and drug traffickers who imported or helped to import drugs into the United States and elsewhere and who use the Black Market Peso Exchange to funnel drug proceeds to Colombia, Venezuela, and elsewhere.

6. On July 7, 2011, Leonel Gomez-Guzman was arrested in Santo Domingo, Dominican Republic by Dominican authorities, based upon the United States's extradition request. Gomez-Guzman waived his rights to a formal extradition proceeding and agreed to return to the United States to be prosecuted for the crime charged in the Indictment. On July 27, 2011, Gomez-Guzman

was returned to the United States and is currently in custody pending trial.

7. Under United States law, a criminal prosecution may be commenced by a grand jury when it decides to return and file an indictment with the Clerk of the United States District Court. A grand jury is composed of no fewer than sixteen (16) people whom the United States District Court selects at random from the residents of its district. The grand jury is an independent body supervised by the judicial branch of the government. The purpose of the grand jury is to examine the evidence of crimes presented to it by United States law enforcement authorities. After independently reviewing this evidence, each member of the grand jury must determine if there is probable cause to believe that a crime has been committed and that the particular defendant or defendants committed the crime. After at least twelve (12) members of the grand jury affirmatively vote that there is probable cause to believe that the defendant or defendants committed the crime or crimes, the grand jury returns an indictment. An indictment is a formal document that charges a defendant or defendants with a crime or crimes, describes the specific laws which a defendant is accused of violating, and describes the acts of a defendant that are alleged to be violations of the law. After the grand jury returns an indictment, a warrant for the defendant's or defendants' arrest is issued by a United States District Judge or Magistrate Judge.

## THE CHARGES AND PERTINENT UNITED STATES LAW

8. On February 3, 2011, a federal grand jury in the District of Massachusetts returned and filed the Indictment against Marwan CHEBLI, alias Marwan Chebli Chebli, alias "El Turko," alias "Samir," (hereinafter, "CHEBLI"), charging him and another with one count of conspiracy to: (a) conduct, and attempt to conduct, financial transactions, which involved the proceeds of drug trafficking and which were designed to conceal and disguise the nature, location, source, ownership

3

and control of the proceeds; (b) conduct, and attempt to conduct, financial transactions, which involved the proceeds of drug trafficking in order to avoid a transaction reporting requirement; (c) transport, and attempt to transport, monetary instruments from inside the United States to or through a place outside the United States and to a place inside the United States from or through a place outside the United States, knowing that the monetary instruments represented the proceeds of drug trafficking and which were designed to conceal and disguise the nature, location, source, ownership and control of the proceeds; (d) transport, and attempt to transport, monetary instruments from inside the United States to or through a place outside the United States and to a place inside the United States from or through a place outside the United States, knowing that the monetary instruments represented the proceeds of drug trafficking to avoid a transaction reporting requirement; and (e) engage, and attempt to engage, in monetary transactions, in amounts greater than $10,000, which involved the proceeds of drug trafficking; in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i), 1956(a)(1)(B)(ii), 1956(a)(2)(B)(i), 1956(a)(2)(B)(ii) and 1957, all in violation of Title 18, United States Code, Section 1956(h).

9. The Indictment also contains a forfeiture allegation pursuant to Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853, seeking the forfeiture to the United States of any property consisting of or derived from any proceeds which the defendants obtained as the result of the criminal actions alleged in the Indictment, and any property which they used or intended to use to commit or facilitate the commission of these criminal actions.

10. On February 3, 2011, the Honorable Judith G. Dein, Chief United States Magistrate Judge, District of Massachusetts, ordered the issuance of a warrant for the arrest of CHEBLI, based on the charge in the Indictment.

4

11. It is the practice of the United States District Court for the District of Massachusetts to retain the original indictment and warrant of arrest and file them with the records of the court. Therefore, I have obtained true and accurate copies of the Indictment and arrest warrant from the Clerk of the Court and have attached them to this affidavit as **Exhibit A** and **Exhibit B**, respectively.

12. The relevant portions of the statutes cited above and below are attached hereto as **Exhibit C**. Each of these statutes was duly enacted and in force at the time that the offenses were committed and at the time the Indictment was returned, and they remain in full force and effect. A violation of any of these statutes constitutes a felony under United States law.

13. The statute of limitations for prosecuting the crime charged in the Indictment is governed by Title 18, United States Code, Section 3282. The statute of limitations merely requires that a defendant be formally charged within five years of the date that the offense or offenses were committed. Once an indictment has been filed in a federal district court, as with these charges against CHEBLI, the statute of limitations is tolled and no longer runs. This prevents a criminal from escaping justice by simply hiding out and remaining a fugitive for an extended period of time.

14. I have thoroughly reviewed the applicable statute of limitations, and the prosecution of the charges in this case is not barred by the statute of limitations. Since the applicable statute of limitations is five years, and the Indictment, which charges criminal violations occurring between April 2007 and February 2011, was filed on February 3, 2011, CHEBLI was formally charged within the prescribed five-year time period.

15. Count One of the Indictment charges CHEBLI with conspiracy to launder money. Under United States law, a conspiracy is simply an agreement to violate another criminal statute. In other words, the act of agreeing, or coming to a mutual understanding with one or more other

5

persons to try to accomplish a common and unlawful plan is a crime in and of itself. Such an agreement need not be formal, and may simply be an oral or implicit understanding between the conspirators. Also, under United States law, the names of other co-conspirators are not required to be listed in the Indictment. Because the essence of a conspiracy offense is the making of the scheme itself, it is not necessary for the prosecution to establish that the conspirators actually succeeded in accomplishing their unlawful plan. A person may become a member of a conspiracy without full knowledge of all of the details of the unlawful scheme, or the names and identities of all of the other conspirators. Consequently, if a defendant has a general understanding of the unlawful nature of a plan and knowingly and willfully joins in that plan on at least one occasion, that is sufficient to convict him of conspiracy, even if he had not participated before, and even if he played only a minor part.

16. In order to convict CHEBLI of the conspiracy charged in Count One of the Indictment, the United States must show that CHEBLI knowingly and intentionally combined, conspired, confederated, and agreed with at least one other person, known or unknown, to launder money. The United States must further prove that CHEBLI, knowing the unlawful purpose of the plan, willfully joined in it. The maximum term of imprisonment for the offense charged in Count One of the Indictment is 20 years in prison.

17. CHEBLI has not been tried or convicted of any offenses charged in this Indictment nor has he been sentenced to serve any sentence in connection with this case.

18. The United States will prove its case against CHEBLI through eyewitness testimony and through the use of physical evidence, such as lawfully recorded phone calls and lawful audio-recordings of meetings.

## SUMMARY OF THE FACTS OF THE CASE

19. The evidence against CHEBLI consists principally of: (i) statements of cooperating witnesses given to law enforcement officials of the United States; (ii) statements and physical surveillance observations of United States law enforcement agents; (iii) photographs, deposit slips and other physical evidence seized and/or obtained during this investigation; and (iv) lawfully recorded telephone calls and lawfully recorded meetings at which CHEBLI and others were present and participating in criminal activity.

20. On October 19, 2010, in coordination with Dominican Republic law enforcement authorities, DEA agents met with a cooperating witness (hereinafter, "CW-1") in Santo Domingo, Dominican Republic. CW-1 has previously provided reliable information that has led directly to significant drug seizures, the arrest of numerous individuals, and the seizure of significant quantities of United States currency in multiple districts within the United States and in several jurisdictions outside of the United States. When DEA agents met with CW-1 on October 19, 2010, CW-1 had just concluded a meeting with CHEBLI and Leonel Gomez-Guzman (hereinafter Gomez-Guzman).

21. On October 19, 2010, CW-1 met with CHEBLI at a café inside a hotel in Santo Domingo, Dominican Republic. CW-1 lawfully audio-recorded the meeting with CHEBLI, as well as all the telephone calls in advance of the meeting. When CHEBLI arrived at the café, he introduced himself to CW-1 as "Samir" and introduced his partner, a Dominican male, as "Leonel," later identified as Gomez-Guzman. CW-1 later told DEA agents that "Leonel" was an active participant throughout the meeting. At the October 19, 2010 meeting, CHEBLI, Gomez-Guzman and CW-1, as described more fully below, discussed various options for transporting multi-hundred kilogram loads of cocaine into the United States from various countries in South America, Central

7

America, and the Caribbean.

22. During the meeting on October 19, 2010, CHEBLI told CW-1 that he was presently taking loads of cocaine out of Venezuela to Honduras. CHEBLI stated that he had an airplane in Florida which he had purchased, but that he still owed $475,000 for the airplane, and as a result the owner would not release the airplane. In response, CW-1 told CHEBLI that CW-1 also had an airplane which CW-1 could use to go from the Dominican Republic to Workers Cay, Bahamas. CW-1 then stated that once in Workers Cay, CW-1 could make arrangements to have the plane fly from the Bahamas to Boston, Massachusetts. CW-1 told CHEBLI that CW-1 preferred to transport cocaine from Santo Domingo, to which CHEBLI replied that he had some "merchandise" (referring to cocaine) in the Dominican Republic, but that it was mostly sold locally.

23. CHEBLI then asked CW-1 if CW-1 could assist with the transport of cocaine loads from Venezuela, to which CW-1 replied that, "my people won't go there." CHEBLI then told CW-1 that he would arrange for a "black flight plan" (meaning that no one from the Venezuelan government would harass the plane), and gave assurances that nothing would happen to the plane. In spite of this offer, CW-1 declined to take cocaine from Venezuela for CHEBLI.

24. CHEBLI and Gomez-Guzman then asked CW-1 if CW-1 could take a cocaine load from Aruba and/or Curacao, to which CW-1 stated that it was a possibility. CHEBLI said that he had an alternate cocaine source in Aruba, whom he referred to as "El Viejo." CHEBLI also said that "El Viejo" would want money up front, to which CW-1 replied that CW-1's fee to transport the cocaine would be 30% of the load. In response, CHEBLI said that he would do a 50-kilogram load to start, which CW-1 rejected, saying it was not worth the trouble. CW-1 then explained that his/her plane could hold up to 1,200 kilograms and that it was thus not worthwhile to do a trip for anything

8

less than 200 kilograms.

25. CW-1 also stated that before he/she would pick up any load, CW-1 wanted $175,000 paid up front, to which CHEBLI replied that it was not a problem, and said that he could wire the money to any bank account CW-1 provided. CW-1 said that he/she would make arrangements to fly the load to a location outside of Boston, and asked CHEBLI about the price per kilogram, to which CHEBLI replied that his customers were in New York, but they could collect the cocaine in Boston. CHEBLI told CW-1 that the price was $27,000 per kilogram. CHEBLI also said that current price per kilogram of cocaine in Venezuela and Colombia was approximately $6,000.

26. Finally, at the October 19, 2010 meeting, CHEBLI raised the possibility of CW-1 transporting cocaine from Ecuador, and specifically told CW-1 that he wanted to place his own pilot (referring to a co-pilot) on the plane during the smuggling trip from Ecuador to the United States, to which CW-1 replied that CW-1 understood, but that CW-1 would need a copy of a valid passport and all of that pilot's flight certifications before CW-1 would consider allowing CHEBLI to place a co-pilot on the plane.

27. On November 19, 2010, acting in an undercover capacity, DEA picked-up approximately $231,125 in drug proceeds from Gomez-Guzman in Miami, Florida on behalf of CHEBLI. The arrangements setting up that money pick-up are described in detail below.

28. On November 11, 2010, at approximately 3:58 p.m., a DEA Undercover Agent (hereinafter UCA) received a text message in Spanish from a phone number on which CHEBLI had previously communicated with the UCA. The text message was:

> Hi, how are you, is el turco. Could you please be on the look out tomorrow or Saturday for something at the beach, I already sent my friend over there to be sure

29. That same day, after receiving the message the UCA called CHEBLI, who told the UCA that a very close friend of CHEBLI's traveled to the place that CHEBLI had referred to in his text to the UCA (referring to the beach, or Miami). CHEBLI also told the UCA that CHEBLI's friend would pick it up and call the UCA when he was ready to conduct the transaction. The UCA asked CHEBLI the amount of the pick-up, to which CHEBLI replied, "is a lot, is more than one, but the first one is going to be one whole one" (referring to one million dollars). The UCA told CHEBLI that he would conduct the pick-up for a commission of 4%, which CHEBLI agreed was okay.

30. On November 12, 2010, at approximately 3:08 p.m., the UCA received a call from an unknown male, later identified as Gomez-Guzman, in which Gomez-Guzman told the UCA that he was calling on behalf of "El Turco." Gomez-Guzman told the UCA that he did not have the "documents" (referring to currency) at this time, but would probably call the UCA later that date or the next day. The UCA then asked Gomez-Guzman if the pick-up was for "one big one" (referring to one million dollars), to which Gomez-Guzman stated that it was, and that he would call the UCA when he had the documents in hand. For technical reasons, the UCA was unable to record this phone call.

31. On November 19, 2010, at approximately 1:15 p.m., the UCA received a call from CHEBLI in which CHEBLI stated that his friend (referring to Gomez-Guzman) had around $230,000 or $240,000 and asked the UCA if the UCA could pick-up the money that day. The UCA asked CHEBLI if he thought it was better to wait until Gomez-Guzman had collected the whole amount (referring to the one million dollars), to which CHEBLI replied that it was urgent because CHEBLI needed it to pay for a plane that a "friend" (referring to a drug associate) had purchased. CHEBLI further told the UCA that he needed to pay for the plane that day and that the payment was around

10

$185,000 or $189,000, to which the UCA replied that he would call CHEBLI back to let him know if he could conduct the pick-up on that date.

32. On November 19, 2010, at approximately 1:45 p.m., the UCA received an e-mail from CHEBLI providing specific wiring instructions for the money. CHEBLI wanted the money wired to two separate accounts associated with aircraft brokerage companies.

33. On November 19, 2010, at approximately 2:24 p.m., the UCA called CHEBLI and told him that the UCA's associate (referring to another DEA undercover agent) was going to conduct the pick-up. The UCA told CHEBLI that while the UCA personally wanted to conduct the pick-up, the UCA was from Boston, not Miami, and it would be easier if the UCA's associate conducted the pick-up.

34. CHEBLI then told the UCA that he wanted the pick-up to be for at least $185,000 because it was the most important one, to which the UCA replied that CHEBLI should have Gomez-Guzman bring whatever he had in his possession, $230,000 or $240,000. CHEBLI said the pick-up was going to be $230,000.

35. At approximately 2:25 p.m., the UCA and Gomez-Guzman engaged in a series of lawfully recorded calls regarding the logistics for the money pick-up. The UCA told Gomez-Guzman that the UCA's associate would provide the code, "looking for Tony on behalf of El Tio," when he called Gomez-Guzman.

36. At approximately 5:13 p.m., CHEBLI called the UCA and said that arrangements had been made to conduct the pick-up. CHEBLI then asked the UCA if the UCA had received the accounts via e-mail and if the UCA could wire the money to those accounts. The UCA replied that the UCA had received the accounts but that it would be impossible to conduct the wire transfers after

the pick-up that day because the bank would be closed.

37. At approximately 5:15 p.m., surveillance agents in Miami, Florida observed an unidentified female enter the lobby of a Holiday Inn carrying a black roll-away carry-on suitcase. At approximately 5:40 p.m., agents observed Gomez-Guzman walk outside the Holiday Inn with what appeared to be the same black suitcase, open the rear passenger door of a DEA UCA's vehicle, close that door, open the front passenger door, enter the vehicle, and then exit the vehicle two minutes later without the black suitcase. Upon inspection by DEA agents, the black suitcase contained $231,125 in United States currency. The denomination of the bills was as follows:

> $100 bills - $17,900
> $50 bills - $9,350
> $20 bills - $184,000
> $10 bills - $14,210
> $5 bills - $5,525
> $1 bills - $140

DEA took photographs of the money before sending it to its undercover bank account. The deposit slips for the wire transfers were maintained as evidence. Once DEA deposited the cash into its undercover account, the money was wired to various accounts provided by CHEBLI, as described below.

38. On November 22, 2010, at approximately 1:54 p.m., the UCA sent CHEBLI a text message stating that the final count for the pick-up was $231,125 and that the UCA would notify CHEBLI as soon as the wire transfers were conducted. CHEBLI did not reply to this text message; however, at approximately 4:34 p.m., CHEBLI called the UCA and indicated that he had received the UCA's text message.

39. On November 23, 2010, at approximately 9:48 a.m., the UCA called CHEBLI and

12

told him that the wire transfers were complete and that the UCA would send CHEBLI the last four digits of each wire transfer via text message, which CHEBLI stated was okay. At approximately 10:13 a.m., the UCA sent CHEBLI a text message providing him with the last four digits of each wire transfer and the bank sender's information.

## IDENTIFICATION

40. CHEBLI, alias Marwan Chebli Chebli, alias "El Turko," alias "El Turco," alias "Samir," is a citizen of Lebanon and also has a Colombian visa. His travel documents are attached to this affidavit as **Exhibit D**. CHEBLI was born on May 12, 1978. He is described as a Middle Eastern male, standing approximately 5 feet, 8 inches to 5 feet,10 inches tall, with dark eyes and dark hair. CHEBLI is currently in law enforcement custody in the Dominican Republic. His parents are believed to be Chebli Chebly and Fayza Omaiz. A photograph of CHEBLI is attached as **Exhibit E**.

41. As described above, CW-1 has met with CHEBLI in person and has identified the **Exhibit E** as the person with whom CW-1 met along with Gomez-Guzman on October 19, 2010, and who identified himself as "Samir." In addition, CW-1 recognizes CHEBLI's voice from both his in-person meetings and telephone conversations with CHEBLI. CW-1 has identified CHEBLI's voice on the intercepted calls between CHEBLI and the UCA. Finally, CW-1 used the same telephone contact numbers for CHEBLI that the UCA used to communicate with CHEBLI.

//

//

//

//

## CONCLUSION

42. Based on all the evidence, I believe that if CHEBLI is returned to the District of Massachusetts to stand trial, the evidence will establish that CHEBLI participated in a conspiracy to launder money as charged in the Indictment. This affidavit was sworn to before a Magistrate Judge of the United States District Court for the District of Massachusetts, a person duly empowered to administer an oath for this purpose.

By: _____
Zachary R. Hafer
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210

Sworn and Subscribed Before Me this ___ Day of November, 2011.

_____
HONORABLE LEO T. SOROKIN
United States Magistrate Judge
District of Massachusetts